# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL ATHLETIC TRAINERS' ASSOCIATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| VS. | ) ) | 3:08-CV-0158-G |
| AMERICAN PHYSICAL THERAPY ASSOCIATION, ET AL., | ) ) ) | **ECF** |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the following motions:  (1) the motion of the defendant,

Orthopaedic Section, APTA, Inc. ("Orthopaedic Section") to dismiss the complaint of

the plaintiff, National Athletic Trainers' Association, Inc. ("NATA") for lack of

personal jurisdiction; (2) the motion of the defendants, American Physical Therapy

Association ("APTA") and Orthopaedic Section, to dismiss the complaint for failure

to state claim; (3) the NATA's motion to strike; (4) the APTA's motion to transfer

venue; and (5) the NATA's motion to compel and motion to strike.  For the reasons

set forth below, the Orthopaedic Section's motion to dismiss for lack of personal

jurisdiction is granted, the APTA's motion to dismiss is denied, the NATA's motion

to strike is denied, the ATPA's motion to transfer venue is denied, and the NATA's

motion to compel is denied.

## I. BACKGROUND

This antitrust suit was commenced on February 1, 2008, and the plaintiff

amended its complaint on February 15, 2008, alleging four causes of action under the

Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.  See generally* First Amended Complaint

and Application for Injunctive Relief ("Complaint").  The NATA is the professional

membership association for athletic trainers, with an estimated 30,000 members

worldwide.  Complaint ¶ 7.  The APTA is the membership association for physical

therapists, with an estimated membership of over 71,000.  *Id.* ¶ 8.  The Orthopaedic

Section is a component of the APTA created to advance the practice of orthopaedic

physical therapy, with a membership of over 13,000.  *Id.* ¶ 9.

The NATA alleges that the defendants have acted in concert and caused

substantial harm to the NATA, and to competition in general, by engaging in conduct

designed to acquire and maintain monopoly power over certain areas of what the

NATA has designated the "manual therapy" market.  *See generally* Complaint.

Athletic trainers ("ATs") work to prevent, diagnose, and treat medical

conditions involving impairment, functional limitations, and disabilities.  Complaint

¶ 10.  The NATA Educational Competencies and Board of Certification Standards

sets forth the procedures and techniques ATs are certified for and qualified to perform. *Id.* ¶ 11. ATs utilize a wide range of manual therapy procedures and techniques to improve the physical well-being and mobility of their patients. *Id.* Generally, the NATA defines manual therapy as "the skilled use of hands to evaluate or treat a musculoskeletal condition." *Id.* ¶ 12. In the context of athletic training, however, the NATA claims that manual therapy "include[s] techniques such as mobilization and manual traction." *Id.* Physical therapists ("PTs") are also licensed to perform mobilization and manual traction under similar conditions, creating an area of overlap between the two professions. *Id.*

In this case, the NATA complains that the defendants improperly claim that the manual therapy techniques at issue are exclusively within the purview of PTs. *Id.* ¶ 13. The NATA claims that the APTA, and its affiliated organizations such as the Orthopaedic Section, wrongfully exclude ATs from the manual therapy market by coercing its members into refusing to educate ATs on techniques, by barring ATs from attending certain continuing education courses, by representing to the public that certain procedures are exclusively within the purview of PTs, and through additional anti-competitive conduct. *Id.* ¶ 16.

Specifically, the NATA cites an instance where a PT was instructed by letter that, due to concerns about protecting the physical therapy profession, she should not teach a course to ATs on "joint mobilization of the lumbar spine." Complaint ¶ 17;

Letter dated November 19, 2007, *attached to* Complaint *as* Exhibit 1. Additionally, in a letter dated November 19, 2007, the Orthopaedic Section advised several dual-credentialed PT/ATs that presenting on certain topics at a NATA continuing education conference was against APTA policies, as the manual therapy techniques to be taught were "exclusively" within the purview of PTs. Complaint ¶ 19. The NATA claims that, as a direct result of the November 19, 2007 letter, several presenters withdrew from the conference, injuring the NATA's reputation and causing it to scramble to find replacement speakers. *Id.* ¶ 21.

Furthermore, the NATA alleges, the APTA, through an agreement with the publisher of the *Coders' Desk Reference for Procedures*,[1] manipulates the descriptions and definitions in the manual to favor PTs and hinder the practice of ATs. *Id.* ¶ 22. Finally, the NATA generally alleges that members of the ATPA have excluded ATs from continuing education conferences, and furthermore that through its "sizable market power and membership," the ATPA has coerced its affiliated organizations (including the Orthopaedic Section) into anti-competitive agreements. *Id.* ¶¶ 18, 23.

As a result of the conduct complained of, the NATA avers, the APTA has harmed competition in the manual therapy market by creating a barrier to entry for

_____

[1] The *Coders' Desk Reference for Procedures*, published by Ingenix, is used by physicians, hospitals, and health care professionals to ensure proper billing for procedures performed by ATs and PTs.

ATs wishing to practice certain manual therapy techniques, and by restricting physicians' choices for their patients' manual therapy services. *Id.* ¶ 24.

Prior to commencement of this suit, the President of NATA, Chuck Kimmel, sent a letter to the APTA's President in which the NATA alleged several "bad acts" on the part of the APTA and also requested that the APTA investigate, address, and resolve the issues brought up by the NATA. *See* Complaint ¶ 25; Letter from Chuck Kimmel, dated December 21, 2007, *attached to* Appendix in Support of Defendant American Physical Therapy Association's Motion to Dismiss *at* Exhibit B.

As a result of the conduct alleged, the NATA now brings suit against the APTA and the Orthopaedic Section alleging four causes of action under the Sherman Act, 15 U.S.C. §§ 1, 2: (1) monopolization; (2) attempted monopolization; (3) illegal contracts, combinations, or conspiracies in restraint of trade; and (4) group boycott. *See generally* Complaint. The NATA seeks treble damages and attorneys' fees, as well as injunctive relief, against the defendants. *Id.*

## II. <u>ANALYSIS</u>

Initially, the court will consider the standing issue raised by the APTA; then, it will take up the Orthopaedic Section's motion to dismiss for lack of personal jurisdiction. Next, it will turn to the APTA's motion to dismiss under Rule 12(b)(6), and finally it will consider the APTA's motion to transfer venue.

A.  <u>Standing</u>

Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies."  U.S. CONST. Art. III § 2.  Standing -- *i.e.*, the need to show that the plaintiff has a direct, personal stake in the outcome of the suit -- is an "essential and unchanging part" of this case-or-controversy requirement.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines."  *United States v. Hays*, 515 U.S. 737, 742 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231 (1990)) (internal quotation marks omitted); see also *Sommers Drug Stores Company Employment Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 348 (5th Cir. 1989) ("'Standing, since it goes to the very power of the court to act, must exist at all stages of the proceeding, and not merely when the action is initiated or during an initial appeal.'") (quoting *Safir v. Dole*, 718 F.2d 475, 481 (D.C. Cir. 1983), *cert. denied*, 476 U.S. 1206 (1984)); *University of South Alabama v. American Tobacco Company*, 168 F.3d 405, 410 (11th Cir. 1999) (noting that "it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.").  The Supreme Court explained in *Lujan* that the "irreducible constitutional minimum of standing" has three elements:

> First, the plaintiff[s] must have suffered an "injury in fact"
> -- an invasion of a legally protected interest which is (a)

concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" "Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560-61 (internal citations and footnote omitted).

Lack of standing is a defect in subject matter jurisdiction. See *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (citing *Bender v. Williamsport Area School District*, 475 U.S. 534, 541 (1986)); see also *Corrigan*, 883 F.2d at 348 ("standing is essential to the exercise of jurisdiction, and . . . lack of standing can be raised at any time by a party or by the court.") (citing *United States v. One 18th Century Colombian Monstrance*, 797 F.2d 1370, 1374 (5th Cir. 1986), *cert. denied*, 481 U.S. 1014 (1987)).

Federal district courts have the unique power to make factual findings which are decisive of subject matter jurisdiction. See *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.) (citing, among other authorities, *Land v. Dollar*, 330 U.S. 731, 735 n. 4, (1947)), *cert. denied*, 454 U.S. 897 (1981). The district court has the power to dismiss for lack of subject matter jurisdiction -- and thus for lack of standing -- on any one of three separate bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

*Williamson*, 645 F.2d at 413; *Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 904 (5th Cir. 1997); see also *Haase*, 835 F.2d at 907 (noting that, to the extent the assessment of a plaintiff's standing turns on factual evidence, a court may consider all matters developed in the record at the time of its decision).

In an antitrust context, the standing inquiry becomes more complicated. "Standing to pursue an antitrust suit exists only if a plaintiff shows:  1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).  Therefore, to have standing to assert an antitrust claim, the plaintiff must establish an injury caused by the defendant and an antitrust injury.  See *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' conduct unlawful." *Atlantic Richfield Company v. USA Petroleum Company*, 495 U.S. 328, 334 (1990).

1.  *Injury in Fact*

The APTA maintains the NATA has not suffered an "injury in fact" to itself as an organization sufficient to allege an antitrust cause of action.  *See* Memorandum of Law in Support of Defendant American Physical Therapy Association's Motion to Dismiss First Amended Complaint ("APTA's Motion to Dismiss") at 10.  Specifically,

- 8 -

the APTA argues that because the NATA "neither provides nor purchases Manual Therapy, . . . it cannot allege that it has suffered antitrust injury resulting from APTA's conduct." *Id.* at 3. According to the defendant, the APTA and the NATA "do not compete in the alleged relevant market for Manual Therapy," though their members do. *Id.* at 10. The APTA argues that the NATA "cannot meet its burden to allege 'concrete and particularized' injury," so that dismissal is warranted. *Id*. at 11.

In response, the NATA claims that the letter sent by the Orthopaedic Section on November 19, 2007 caused it to suffer an injury as an organization, *see* Response in Opposition to Defendant American Physical Therapy Association's 12(b)(6) Motion to Dismiss and Motion to Strike ("Response") at 5, by damaging the NATA's business reputation and by forcing the NATA to replace speakers at a conference. *Id.* at 5-6. However, injuries of this sort are not antitrust injuries. See *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 541 (1983); *Bell v. Dow Chemical Company*, 847 F.2d 1179, 1183 (5th Cir. 1988); *Chambers Development Company v. Browning-Ferris Industries*, 590 F.Supp. 1528, 1544 (W.D. Pa. 1984). Therefore, the NATA has not alleged an *antitrust* injury sufficient to pursue antitrust claims on its own behalf, and if its claims are to proceed, the NATA must demonstrate standing through some other means.

- 9 -

## 2.  *Associational Standing*

The APTA then contends that the NATA may not pursue the antitrust claims on behalf of its members under an "associational" theory of standing.  APTA's Motion to Dismiss at 11.  The APTA, citing *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342 (1977), asserts that the proper standard for an association to bring an antitrust claim is that (1) all members would otherwise have standing to sue in their own right; and (2) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Id.* The standard the APTA advances, as well as its arguments, are deficient.  In *Warth v. Seldin*, 422 U.S. 490, 511 (1975), the Supreme Court stated:

> "Even in the absence of injury to itself, an association may have standing solely as the representative of its members . . . .  The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . .  So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."

*Id*. at 511 (emphasis added).

The doctrine of associational standing set out in *Warth v. Seldin* was subsequently summarized by the Court in *Hunt* as a three-part test:

> "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt*, 432 U.S. at 343. Elaborating further, the Supreme Court in *Warth* explained that associational standing is in large part dependent on the type of relief sought:

> "(W)hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."

*Warth*, 422 U.S. at 515. The NATA's members would have standing to sue on their own behalf, and the interests the NATA seeks to protect are germane to its purpose. A point of contention between the parties is whether the claim asserted or the relief requested would require the participation of individual members in the lawsuit. *See* APTA's Motion to Dismiss at 11-12; Response at 8.

The defendant relies on *Bano v. Union Carbide Corporation*, 361 F.2d 696, 714 (2d Cir. 2004), to support its argument that the need for individualized proof from the NATA's members defeats any claim it can make for associational standing. However, in *Bano* the plaintiffs were seeking monetary damages, and the requested

relief required individualized proof from each plaintiff regarding the extent of their injuries. *Id.* at 714-15. As explained below, where the NATA seeks injunctive or declaratory relief, and if such relief is granted, "it can reasonably be supposed that the remedy . . . will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.

Thus, to the extent the NATA seeks injunctive and declaratory relief, it has standing to pursue claims on behalf of its members. However, in its first amended complaint, the NATA "brings this action for injunctive relief *and damages* arising out of the APTA's violations of federal antitrust laws." Complaint ¶ 1 (emphasis added). Specifically, the NATA asks for treble damages under 15 U.S.C. § 15, as well as attorneys' fees. *Id.* ¶¶ 51-52. Under *Hunt*, however, the NATA may not seek damages for its members, only injunctive relief. See *Bano*, 361 F.3d at 714 (acknowledging "no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members" due to issues of "individualized proof."). Indeed, the NATA states in its response that "[a]t this time, the NATA does not purport to claim associational standing to pursue claims for money damages on behalf of its memebers." *See* Response at 8 n.6. Accordingly, the court finds that the NATA has standing to pursue claims on behalf of its members for injunctive and declaratory relief only.

B.  Orthopaedic Section's Motion to Dismiss for Lack of Personal Jurisdiction

1.  *The Factual Standard:  A* Prima Facie *Case*

When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident.  *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir.), *cert. denied*, 513 U.S. 930 (1994); *Gardemal v. Westin Hotel Company*, 186 F.3d 588, 592 (5th Cir. 1999).  If the district court chooses to decide the matter without an evidentiary hearing, the plaintiff may meet its burden by presenting a *prima facie* case for personal jurisdiction.  *Wilson*, 20 F.3d at 648; *Gardemal*, 186 F.3d at 592.

The court will take the allegations of the complaint as true, except where they are controverted by opposing affidavits, and all conflicts in the facts are resolved in favor of the plaintiff.  *Wilson*, 20 F.3d at 648; *Gardemal*, 186 F.3d at 592.  In making its determination, the court may consider affidavits, interrogatories, depositions, oral testimony, or any combination of recognized discovery methods.  *Allred v. Moore & Peterson*, 117 F.3d 278, 281(5th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998); *Thompson v. Chrysler Motors Corporation*, 755 F.2d 1162, 1165 (5th Cir. 1985).

2.  *The Legal Standard*

A federal district court may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state permits the exercise of personal jurisdiction over the defendant; and (2) the exercise of such jurisdiction by

the forum state is consistent with due process under the United States Constitution. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). A defendant is amenable to the personal jurisdiction of a federal court sitting in diversity to the same extent that he would be amenable to the jurisdiction of a state court in the same forum.[2] *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 347 (5th Cir. 1984). Applying state law, this court must first determine whether Texas, the forum state, could assert long-arm jurisdiction. *Id.* Because the Texas long-arm statute confers jurisdiction to the limits of the federal constitution, *Access Telecom, Inc. v. MCI Telecommunications Corporation*, 197 F.3d 694, 716 (5th Cir. 1999), *cert. denied*, 531 U.S. 917 (2000); *Hall v. Helicopteros Nacionales de Colombia, S.A.*, 638 S.W.2d 870, 872 (Tex. 1982), *rev'd on other grounds*, 466 U.S. 408 (1984), the court need only concern itself with the federal due process inquiry. *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir.1999); *Wilson*, 20 F.3d at 647 n.1; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 17.041 *et seq.* (Vernon 1997) (Texas long-arm statute).

### 3. *Due Process Requirements*

Due process requires the satisfaction of two elements to exercise personal jurisdiction over a non-resident defendant: (1) the nonresident must have some

---

[2]     This is the traditional analysis in diversity of citizenship cases, where state law supplies the rule of decision. In this case, the plaintiff sues under federal law, *viz.*, 15 U.S.C. § 1 *et seq.* In this situation, federal courts adopt state jurisdictional statutes to reach out-of-state defendants. See *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 482 (5th Cir. 2008), *pet. for cert. filed*, 76 USLW 3611 (May 5, 2008).

minimum contact with the forum that results from an affirmative act on his part such that the nonresident defendant could anticipate being haled into the courts of the forum state; and (2) it must be fair or reasonable to require the nonresident to defend the suit in the forum state. *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 474-78 (1985); *Gulf Consolidated Services, Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1073 (5th Cir.), *cert. denied*, 498 U.S. 900 (1990). The Due Process Clause ensures that persons have a "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)).

To establish minimum contacts with the forum, a nonresident defendant must do some act by which he "purposefully avails [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). However, the unilateral activity of one asserting a relationship with the nonresident defendant does not satisfy this requirement. *Burger King*, 471 U.S. at 474 (quoting *Hanson*, 357 U.S. at 253); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) (citing *Kulko v. California Superior Court*, 436 U.S. 84 (1978); *Hanson*, 357 U.S. at 253). In determining whether the exercise of jurisdiction is appropriate, the Supreme Court has focused less on presence in the forum state as a means to establish jurisdiction and looked increasingly to whether a

defendant's contacts with the forum state make it reasonable to require the defendant to defend the particular suit in that forum. *Quill Corporation v. North Dakota*, 504 U.S. 298, 307 (1992).

Two types of *in personam* jurisdiction may be exercised over a nonresident defendant: specific jurisdiction and general jurisdiction. Specific jurisdiction exists if the cause of action is related to, or arises out of, the defendant's contacts with the forum state and those contacts meet the due process standard. *J.R. Stripling v. Jordan Production Company, LLC*, 234 F.3d 863, 871 (5th Cir. 2000) (quotations and citations omitted). "When a court exercises personal jurisdiction over a defendant based on contacts with the forum related to the particular controversy, the court is exercising 'specific jurisdiction.'" *Holt Oil & Gas Corporation v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (citations omitted), *cert. denied*, 481 U.S. 1015 (1987). General jurisdiction, on the other hand, may be found when the nonresident's contacts with the forum are "continuous and systematic," even though the claim is unrelated to those contacts. *Helicopteros Nacionales*, 466 U.S. at 415-16.

Under either a specific or general jurisdiction analysis, however, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum [s]tate." *Burger King*, 471 U.S. at 474 (quoting *International Shoe Company v. Washington*, 326 U.S. 310, 316 (1945)). The "purposeful availment" requirement of the minimum contacts inquiry "ensures that a

defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . or of the 'unilateral activity of another party or a third person.'" *Id.* at 475 (citations omitted). A plaintiff must establish a substantial connection between the nonresident defendant and the forum state. *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1068 n.9 (5th Cir.), *cert. denied*, 506 U.S. 867 (1992); *Bearry v. Beech Aircraft Corporation*, 818 F.2d 370, 374 (5th Cir. 1987) (citing *Burger King*, 471 U.S. at 475 n. 18; *McGee v. International Life Insurance Company*, 355 U.S. 220 (1957)).

A court must consider all factors when making the purposeful availment inquiry -- "no single factor, particularly the number of contacts, is determinative." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). "[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state." *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982); see also *Coats v. Penrod Drilling Corporation*, 5 F.3d 877, 884 (5th Cir. 1993), *cert. denied*, 510 U.S. 1195 (1994).

4. *Discussion*

In its amended complaint, the NATA alleges that this court has personal jurisdiction over the defendants because "they regularly do business in the State of

Texas" and because the defendants' anticompetitive conduct took place, in whole or in part, in Texas. *See* Complaint ¶ 5.

The Orthopaedic Section argues that the court lacks both general and specific jurisdiction. *See generally* Defendant Orthopaedic Section, APTA, Inc.'s Brief in Support of its Motion to Dismiss for Lack of Personal Jurisdiction ("Orthopaedic's Motion to Dismiss"). Regarding general jurisdiction, the Orthopaedic Section argues that it "does not regularly conduct business in Texas" so as to justify the assertion of jurisdiction over it in Texas. *Id.* at 4.[3]

---

[3] The NATA has also filed a motion to compel compliance with this court's April 9, 2008 order directing the Orthopaedic Section to produce "all documents and communications related to business activities conducted by Orthopaedic Section in or directed towards the State of Texas . . . ." *See* Order (Docket Entry #30). However, after examining the motion to compel and the documents requested by the plaintiff, it does not appear that the Orthopaedic Section has failed to produce responsive documents. *See* Letter from Paul R. Genender to Veronica M. Bates and Alex Shilliday, dated May 8, 2008, *located in* Appendix to NATA's Emergency Motion to Strike Orthopaedic Section, APTA, Inc.'s Motion to Dismiss or to Compel Compliance with Court Order and Brief in Support ("Motion to Compel") *at* 5-7. The requested documents deal with a *future* meeting in San Antonio, which, under the authority of *Access Telecom, Inc. v. MCI Telecommunications Corporation*, 197 F.3d 694, 717 (5th Cir. 1999), *cert. denied*, 531 U.S. 917 (2000), is not germane to the issues before the court. The NATA also seeks documentation regarding letters similar to the one sent November 19, 2007, discussed *supra* Section I, to a scheduled presenter at the Las Vegas convention. For the reasons discussed in Section II(B)(4)(a), such letters do not provide a basis for jurisdiction under *Calder v. Jones*, 465 U.S. 783 (1984), and therefore are not responsive. The Orthopaedic Section produced the list of Texas Orthopaedic Section members who serve on Orthopaedic Section committees. *See* Defendant Orthopaedic Section, APTA, Inc.'s Response to Plaintiff's Motion to Strike or to Compel Compliance with Court Order ("Response to Motion to Compel") at 8. The court agrees with the Orthopaedic Section that any travel expense reports related to meetings for the Journal of

(continued...)

a. Specific Jurisdiction

The Orthopaedic Section argues that it has not purposefully availed itself of the privileges of conducting activities within the State of Texas. Orthopaedic's Motion to Dismiss at 6. The defendant relies on *Management Insights, Inc. v. CIC Enterprises, Inc.*, 194 F.Supp.2d 520 (N.D. Tex. 2001), to support its argument for dismissal. In *Management Insights*, the primary basis for specific jurisdiction was a phone call made by the defendant, located in Indiana, to one of the plaintiff's customers located in Tennessee. *Id.* at 522. The plaintiff, a Texas corporation, argued that because the slanderous statements made in the phone call were directed to Texas, the court had specific jurisdiction. *Id.* at 525. The court declined to find specific jurisdiction, explaining that there was no evidence the statements were directed to Texas, and further explaining that "something more than the mere fortuity of the plaintiff's presence in the forum state was needed to justify assertion of jurisdiction over the defendants." *Id.* at 526.

The plaintiff asserts specific jurisdiction under the "effects test" articulated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789 (1984). *See* National Athletic Trainers' Association, Inc.'s Response in Opposition to Defendant

_____

[3](...continued)
Orthopaedic and Sports Physical Therapy ("JOSPT") are not responsive to the court's order. Finally, the Orthopaedic Section has stated in its response that it does not have responsive documents regarding Texas job postings on its website. Therefore, the NATA's motion to compel is denied.

Orthopaedic Section, APTA, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction ("Jurisdiction Response") at 13-14. In *Calder*, the Supreme Court explained that, under certain circumstances, actions not directed towards a state may form a basis for specific jurisdiction when the "effects" of the conduct are felt in the forum state. *Calde*r, 465 U.S. at 788-90. The petitioner in *Calder* published a libelous article about a California resident, and while the Florida publisher was not responsible for printing the story in California, the Supreme Court explained that the "brunt" of the harm was suffered in California. *Id.* at 789-90.

The NATA characterizes the November 19, 2007 letter sent by the Orthopaedic Section from its headquarters in Wisconsin to a physical therapist in Pennsylvania as conduct the Orthopaedic Section *knew* would cause harm to the NATA in Texas. *See* Jurisdiction Response at 1. The NATA argues that the "brunt" of the injury was felt by the NATA in its home office in Dallas, Texas, and as a result there are sufficient minimum contacts with Texas to support specific jurisdiction. *Id.* at 13-14. To support this contention, the NATA points to the deposition of the Orthopaedic Section's President, Dr. James J. Irrgang, where he admits knowing that the November 19, 2007 letter, which he authorized, would affect the NATA in Dallas, Texas. *See* Deposition of Dr. James J. Irrgang, *attached to* Appendix to Plaintiff National Athletic Trainers' Association, Inc.'s Response in Opposition to Defendant Orthopaedic Section, APTA, Inc.'s Motion to Dismiss for Lack of Personal

Jurisdiction *as* Exhibit A at 32-36, 61-62. However, the portion of Dr. Irrgang's deposition testimony cited by the NATA does not suggest that the primary purpose of the letter was to injure the NATA; Dr. Irrgang was merely acknowledging that the letter *could* have impacted the NATA. *Id.* at 61-62. The facts, as alleged by the plaintiff and as presented in the deposition, are dissimilar to *Calder* and are more akin to *Management Insights* -- the fact that the NATA is located in Texas is a mere "fortuity," and to allow personal jurisdiction would "destroy altogether the limits imposed by due process . . . allow[ing] every plaintiff who filed suit in its home state to justify assertion of jurisdiction over a defendant simply by averring that the plaintiff was injured by the defendant's out-of-state conduct." *Management Insights*, 194 F.Supp.2d at 526. The NATA does not offer any response to the Orthopaedic Section's argument based on *Management Insights*, and the absence of such an argument is telling.

Furthermore, the Orthopaedic Section argues that any allegedly anti-competitive agreements with the APTA would have been entered into outside of Texas, and additionally that any wrongful conduct by the APTA directed at Texas cannot be imputed to the Orthopaedic Section. Orthopaedic's Motion to Dismiss at 8. See *National Architectural Products Company v. Atlas-Telecom Services-USA, Inc.*, 2007 WL 2051125, at *8 (N.D. Tex. July 13, 2007) (explaining that "it does not necessarily follow that the personal jurisdiction over one conspirator may be imputed

to another coconspirator.").  Finally, the Orthopaedic Section asks the court to consider issues of fair play and substantial justice, including the "burdensome travel and expense" associated with litigating a dispute in Texas.  Orthopaedic's Motion to Dismiss at 8.  The court finds that the issues of fair play and substantial justice do not weigh for or against personal jurisdiction.

Taking all of the above into account, this court declines to exercise specific personal jurisdiction over the Orthopaedic Section.  To do so would violate the limits of due process.

### b.  General Jurisdiction

In response to the Orthopaedic Section's motion to dismiss for lack of personal jurisdiction, the NATA alleges numerous facts that purportedly establish general jurisdiction through continuous and systematic contacts.  *See* Jurisdiction Response at 7-9.  The NATA cites the following facts to support general jurisdiction:  (1) a planned meeting for the Orthopaedic Section's board of directors set to take place in San Antonio, Texas in June of 2008;[4] (2) a January 2007 meeting in Dallas, Texas, attended by Orthopaedic Section board members relating to the Journal of Orthopaedic and Sports Physical Therapy, of which the Orthopaedic Section was a 50% owner at the time; (3) approximately 356 continuing education courses sold

---

[4]    However, future contacts are not to be considered when evaluating general jurisdiction. *Access Telecom, Inc. v. MCI Telecommunications Corporation*, 197 F.3d 694, 717 (5th Cir. 1999), *cert. denied*, 531 U.S. 917 (2000).  The instant motion to dismiss was filed by the Orthopaedic Section on March 26, 2008.

through the Internet to Texas residents over a 5-year period; (4) certificates mailed from the Orthopaedic Section headquarters to Texas residents who completed the continuing education courses; (5) advertisements published in the Orthopaedic Section's journal that are marketed and sold to Texas-based companies; (6) a strategic membership plan targeting Texas for increased membership; (7) over 700 active, dues-paying members of the Orthopaedic Section reside in Texas, several of which pay their dues online via credit card; (8) awarding grants and awards to Texas members; and (9) maintaining an interactive bulletin board for Texas members to post and respond to messages. *Id.* at 7-9.

To refute general jurisdiction, the Orthopaedic Section relies primarily on two cases to support its motion to dismiss: *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2002) and *Management Insight*, discussed *supra*. *See* Orthopaedic's Motion to Dismiss at 4-6. In *Revell*, a Texas resident brought a defamation suit against Columbia University, and the Fifth Circuit Court of Appeals examined the interplay between internet web sites and general jurisdiction, finding that "[t]hough the maintenance of a website is, in a sense, a continuous presence everywhere in the world, the cited contacts of [the defendant] with Texas are not in any way 'substantial.'" *Revell*, 317 F.3d at 471. The "cited contacts" included sparse internet sales to Texas residents, similar to those of the defendant in the instant case. *Id* The court in *Revell* found the advertising sales did not support general jurisdiction, noting that while the defendant "may be doing

business *with* Texas, it is not doing business *in* Texas." *Id.* at 471 (emphasis in original) (citing *Access Telecom*, 197 F.3d at 717).

The Orthopaedic Section admits that a "small percentage of its members" are located in Texas, but it argues, citing *Golf City, Inc. v. Wilson Sporting Goods Company, Inc.*, 555 F.2d 426, 437-38 (5th Cir. 1977), that the presence of its members alone is insufficient to support general jurisdiction. Orthopaedic's Motion to Dismiss at 5. The court agrees.

With respect to the JOSPT contacts, the court concludes that any contacts with the State of Texas by members of the Orthopaedic Section acting in their capacity as directors of the JOSPT cannot be used to establish personal jurisdiction over the defendant. The plaintiff has to show more than the existence of a parent-subsidiary relationship between the Orthopaedic Section and JOSPT.

Finally, the NATA looks to other traditional contacts, citing internet sales, seven hundred dues-paying members, and the award of research grants by the O.S. to Texas residents. In the court's opinion, these contacts are too insubstantial to be a basis for the exercise of general jurisdiction over the Orthopaedic Section.

c. Antitrust Statute as a Basis for Jurisdiction

Finally, the plaintiff argues that jurisdiction is proper under 15 U.S.C. § 22, the nationwide service of process provision of the antitrust statute. Jurisdiction Response at 21-22. 15 U.S.C. § 22 provides:

> Any suit, action, or proceeding under the antitrust laws
> against a corporation may be brought not only in the
> judicial district whereof it is an inhabitant, but also in any
> district wherein it may be found or transacts business; and
> all process in such cases may be served in the district of
> which it is an inhabitant, or wherever it may be found.

The NATA argues that, because venue is proper in Texas, it follows that jurisdiction is proper over the Orthopaedic Section under 15 U.S.C. § 22. Jurisdiction Response at 21. The court disagrees. The NATA's reliance on *Management Insights* is misplaced; the Orthopaedic Section, does not inhabit the district (as it is incorporated under Delaware law), is not "found" in the district, and despite the NATA's argument to the contrary, does not transact business in this district. "Courts have found that a corporation transacts business within their forum jurisdictions when a substantial business activity is performed within the jurisdiction with continuity of character, regularity, contemporaneous with the service and not looking toward cessation of business." *Id.* at 532-533 (quoting *Daniel v. American Board of Emergency Medicine*, 988 F.Supp. 127, 260 (W.D. N.Y. 1997)).

For the reasons set forth above in Section II(B)(4)(b), the court finds that the defendant Orthopaedic Section does not "transact business" in this district. Therefore, jurisdiction is not proper under 15 U.S.C. § 22, and the plaintiff's claims against the defendant Orthopaedic Section are dismissed for lack of personal jurisdiction.

C.  <u>Motion to Dismiss for Failure to State a Claim</u>

The APTA has moved to dismiss the plaintiff's claims pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure.  *See* Memorandum of Law in
Support of Defendant American Physical Therapy Association's Motion to Dismiss
First Amended Complaint ("APTA's Motion to Dismiss").  The APTA raises several
arguments in support of its motion to illustrate deficiencies in the NATA's antitrust
claims.  In its response, the NATA has moved to strike several portions of the APTA's
motion to dismiss.  *See* Response at 2-3.  However, the court has not relied upon this
evidence in making its determination of the motions before it; therefore, the court
does not express any opinion on this evidence at this time.  Accordingly, the
plaintiff's motion to strike is denied as moot.

1.  *Legal Standard for Rule 12(b)(6) Motion to Dismiss*

"To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to
state a claim relief that is plausible on it's face.'"  *In re Katrina Canal Breaches
Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*,
__ U.S. __, 127 S.Ct. 1955, 1974 (2007)).  "While a complaint attacked by a Rule
12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's
obligation to provide the grounds of his entitlement to relief requires more than labels
and conclusions, and a formulaic recitation of the elements of a cause of action will
not do."  *Bell Atlantic*, 127 S.Ct. at 1964-65 (citations, quotations marks, and

brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal*, 495 F.3d at 205 (internal quotation marks omitted) (quoting *Bell Atlantic*, 127 S.Ct. at 1965). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted) (quoting *Martin K. Eby Construction Company v. Dallas Area Rapid Transit,* 369 F.3d 464 (5th Cir. 2004)).

### 2. *Relevant Product and Geographic Markets*

The APTA asserts that the "manual therapy" market cannot form the basis for an antitrust claim, and furthermore, that the relevant geographic market of "the entire United States" is overly broad. *See generally* APTA's Motion to Dismiss at 13-19.

Section 1 of the Sherman Antitrust Act forbids all contracts, combinations, or conspiracies in restraint of trade or commerce among the states or with foreign countries. 15 U.S.C. § 1. To prevail on a section one claim, the plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market. *Johnson v. Hospital Corporation of America*, 95 F.3d 383, 392 (5th Cir. 1996).

The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992).

As a prerequisite to any antitrust claim, the plaintiff must allege a relevant market in which the anticompetitive effects of the challenged activity can be assessed. See *Geddie v. Seaton*, 2006 WL 2263335, *5 (N.D. Tex. August 8, 2006). "Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist." *United States v. Eastman Kodak Company*, 63 F.3d 95, 104 (2d Cir. 1995). A relevant market is comprised of a market for the specific product at issue, the market for reasonably interchangeable products, and a geographic market, the area in which sellers of the relevant product effectively compete. See *United States v. E.I. du Pont de Nemours & Company*, 351 U.S. 377, 395 (1956).

a. Relevant Services Market

To begin, the APTA argues that the services market alleged by the NATA is implausible and insufficient to maintain an antitrust claim. *See* APTA's Motion to Dismiss at 15-18. Citing the NATA's failure to include all products or services that are reasonably interchangeable or substitutable, the APTA asserts that "NATA vaguely defines the relevant services market as 'the area where the Manual Therapy

techniques performed by ATs and PTs overlap." *Id.* at 15. However, the services market alleged by the NATA is not so vague and undefined as the APTA suggests.

The services market for manual therapy, as set out in the plaintiff's complaint, explains what manual therapy is, how and when it is used by both ATs and PTs, and how the practices overlap. *See* Complaint ¶¶ 10-12, 29. Furthermore, the NATA adequately distinguishes the line of cases relied upon by the APTA. *See* Response at 11-13. The APTA relies on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), *cert. denied*, 523 U.S. 1059 (1998), to support its argument for dismissal. *See* APTA's Motion to Dismiss at 16. In *Queen City Pizza*, the court found that the plaintiff's proposed relevant market of supplies and ingredients approved by Domino's Pizza was too narrow, in that the same ingredients and supplies were available from other sources. *Id.* at 437-38. Here, the APTA argues that, similar to pizza ingredients, Manual Therapy, as defined by the plaintiff, is available from other sources, such as "occupational therapists, chiropractors, orthopedists, physiatrists" and others. APTA's Motion to Dismiss at 17. However, it does not necessarily follow that Manual Therapy, as described by the plaintiff, is available from numerous, interchangeable sources, other than ATs and PTs. Therefore, the court finds that the NATA has sufficiently defined a plausible services market.

b.  Relevant Geographic Market

With respect to the geographic market, the APTA argues that the "entire United States" is a "facially preposterous" geographic market.  *Id.* at 18.  However, at this stage of the litigation, it is not implausible or preposterous to allege a national market for manual therapy.  The alleged anticompetitive conduct of the APTA takes place on a national scale, and, to the extent it can be proven, stands to affect ATs across the country.  Indeed, the APTA notes that "[i]t is beyond serious question that *very few*, if any, patients would travel across the country to obtain PT or AT services . . . ."  *Id.* at 19 (emphasis added).  If it is only a handful of patients that seek the services of PTs and ATs on a nationwide scale -- a question to be addressed as the record is developed -- that would support a nationwide relevant geographic market.

The NATA identified the relevant geographic market as the entire United States.  Complaint ¶ 29.  The APTA argues that because the complaint fails to properly delineate the locations where consumers of manual therapy services would search for such services, the allegations in the complaint are insufficient to state an antitrust claim.  APTA's Motion to Dismiss at 18.  However, there are no heightened pleading requirements in an antitrust case, and this court will not look behind the NATA's allegations at the pleading stage of this case to explore facts concerning the complaint's market definition.  The NATA has alleged a relevant geographical market, and its allegations are sufficient to state a claim.  If the APTA wants to

introduce evidence that this is not in fact the relevant market, that is a matter for summary judgment or trial -- not a Rule 12(b)(6) motion.

### c. Market Power

Additionally, the court finds that the plaintiff has sufficiently pleaded the market power element of a monopolization claim, alleging, *inter alia*, anti-competitive conduct on the part of APTA aimed at creating barriers to entry for ATs into the Manual Therapy market and manipulating billing definition codes to favor the practice of PTs. *See* Complaint ¶¶ 23, 33. At this stage of the litigation, these allegations, however thin they may appear, are sufficient. See *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1051-52 (9th Cir. 2008) (noting that the resolution of the market power question is inappropriate at the Rule 12(b)(6) stage), *pet. for cert. filed*, 76 USLW 3646 (May 28, 2008).

### d. Failure to State a Claim

Finally, the APTA argues that, even assuming the NATA has properly alleged antitrust claims, they fail as a matter of law. *See* APTA's Motion to Dismiss at 21-24. The court disagrees. While it is true that antitrust laws do not preclude a trade association such as the NATA from providing information and recommendations to others, *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989), that is not what the NATA is alleging. The NATA has met the requirements of Federal Rule of Civil Procedure 8.

D.  The APTA's Motion to Transfer Venue

Additionally, the APTA has moved to transfer this case to the Eastern District
of Virginia.  *See generally* Memorandum of Law in Support of Defendant American
Physical Therapy Association's Motion to Transfer Venue ("Motion to Transfer").
The APTA cites two grounds in support of its motion:  (1) the APTA (and many of
the documents and people associated with this case) is headquartered in Alexandria,
Virginia, which is located in the Eastern District of Virginia; and (2) the APTA's
belief that this lawsuit was filed "not to resolve legitimate claims . . . but instead . . .
to impose extraordinary litigation costs" on the defendants.  *Id.* at 1-2.

A district court may transfer any civil case "[f]or the convenience of parties and
witnesses, in the interest of justice . . . to any other district or division where it might
have been brought."  28 U.S.C. § 1404(a).  As a threshold matter, the language of
Section 1404(a) requires the court to determine whether the proposed transferee
district is one in which the suit might have been brought.  *Illinois Union Insurance
Company v. Tri Core, Inc.*, 191 F.Supp.2d 794, 797 (N.D. Tex. 2002).  Such a district
"is one in which upon commencement of the suit the plaintiff ha[d] a right to sue
independently of the wishes of the defendant."  *Independent Fish Company v. Phinney*,
252 F.Supp. 952, 953 (W.D. Tex. 1966) (citing *Hoffman v. Blaski*, 363 U.S. 335
(1960)).  Thus, the first question is whether or not the Eastern District of Virginia
would be a proper venue for this lawsuit.  Under the general federal venue provision,

28 U.S.C. § 1391(b), an antitrust suit may be brought in a "judicial district where "a substantial part of the events or omissions giving rise to the claim occurred." Accordingly, venue would be proper in the Eastern District of Virginia because much of the alleged anticompetitive conduct would have taken place at the APTA's headquarters located in the Eastern District of Virginia.  Though the APTA has satisfied the first part of the inquiry, more must be shown to warrant a transfer of venue.

The plaintiff's choice of forum is entitled to deference which requires that the party seeking transfer "must show good cause" that the transfer is "[f]or the convenience of parties and witnesses, in the interest of justice." *In re Volkswagen of America, Inc.*, 506 F.3d 376 (5th Cir. 2007).  This means that the court should only order a transfer when the "transferee forum is clearly more convenient." *Id.* at 384. The court should "consider a number of private and public interest factors" when considering a motion to transfer. *Id.* at 380.  The private interest factors are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.*  The public interest factors are:  "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the

case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of the law." *Id.*

The APTA argues that "[a]ll of the private concerns weigh in favor of transfer to the Eastern District of Virginia." Motion to Transfer at 7. The defendant claims that a "majority of the likely sources of proof and witnesses" are located at APTA headquarters. *Id.* The defendants argue that their material witnesses reside in Virginia and would benefit from a transfer of venue. *Id.* at 6-7.

Where key witnesses are employees of the party seeking transfer, their convenience is entitled to less weight because that party will be able to compel their testimony at trial. *Frost v. ReliOn, Inc.*, 2007 WL 670550, at *4 (N.D. Tex. Mar. 2, 2007). Accordingly, while the Eastern District of Virginia may provide a more convenient forum for the defendant's witnesses, the APTA can compel its employees to testify in Texas, and transferring this case would simply shift expense from one party to the other. Moreover, because potential witnesses are located in both venues and because each party would incur substantial expense in presenting witnesses in the other forum, this factor does not weigh in favor of a transfer. With respect to the sources of proof, their location is accorded little weight because "technological advances" have made the physical location of evidence less important. *Frost*, 2007 WL 670550 at *4. Therefore, this factor does not favor transfer.

The court finds the defendant's discussion of public concerns do not weigh in favor of transfer. *See* Motion to Transfer at 8-9. Since the defendants have failed to present any arguments concerning any of the other factors, the court infers that they are either neutral or do not favor transfer. Having fully considered the equities in this case, the court concludes that none of the evidence presented by the APTA is sufficient to outweigh the plaintiff's choice of forum. Therefore, the APTA's motion to transfer venue is denied.

## III. CONCLUSION

For the reasons set forth above, the Orthopaedic Section's motion to dismiss for lack of personal jurisdiction is **GRANTED**, the APTA's motion to dismiss is **DENIED**, the NATA's motion to strike is **DENIED**, the APTA's motion to transfer venue is **DENIED**, and the NATA's motion to compel is **DENIED**.

**SO ORDERED**.

September 9, 2008.

_____
**A. JOE FISH**
**Senior United States District Judge**